John Paul JONES and Ruth J. Rubel Jones, Appellants,

v.

UNITED STATES of America, Appellee.

No. 71-1386.

United States Court of Appeals, Tenth Circuit.

Aug. 21, 1972.

Rehearing Denied Sept. 22, 1972.

Walter A. Raymond, Kansas City, Mo. (James L. Baska, Kansas City, Kan., and Kenneth C. West, Kansas City, Mo., with him on the brief), for appellants.

Issie L. Jenkins, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Robert J. Roth, U. S. Atty., Scott P. Crampton, Asst. Atty. Gen., and Meyer Rothwacks and Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel, with her on the brief), for appellee.

Before MURRAH, SETH and BARRETT, Circuit Judges.

MURRAH, Circuit Judge.

This is the second effort of Ruth J. Rubel Jones and her husband John Paul Jones to have certain annual payments, received by Mrs. Jones under the terms of a written agreement, treated as capital gains for tax purposes. In the earlier case a jury determined that the payments received by Mrs. Jones in the 1956 and 1957 taxable years were ordinary income. We affirmed the judgment entered on that verdict. *See* Jones v. United States, 387 F.2d 1004 (10th Cir. 1967), cert. denied, 392 U.S. 927, 88 S.Ct. 2284, 20 L.Ed.2d 1385 (1968). The present action is concerned with payments received by Mrs. Jones under the same contractual arrangement for the taxable years 1958, 1959, 1960 and 1961.

The government pleads the prior judgment as an estoppel to adjudication of the taxpayers' present claim, and made a pretrial motion for summary judgment on those grounds. Apparently out of an abundance of caution, the trial court denied the summary judgment motion, as well as the government's on-trial motion for a directed verdict, and submitted the case to the jury on the same issue presented and decided in the prior case. The jury again returned a verdict in favor of the United States, finding that the payments in question were taxable as ordinary income rather than capital gains. This appeal is from the judgment on the jury's verdict. We affirm the judgment without reaching the alleged trial errors raised on appeal,[1] for we are convinced that the prior judgment on the 1956 and 1957 tax years is conclusive of the claims asserted here for subsequent tax years.

▇▇▇ We arrive at this conclusion fully cognizant of the rule under which collateral estoppel is strictly and spar-

ingly applied in tax cases involving liability for different years. *See* Jones v. Trapp, 186 F.2d 951, 953 (10th Cir. 1950); Gillespie v. Commissioner of Internal Revenue, 151 F.2d 903, 906 (10th Cir. 1945), cert. denied, 328 U.S. 839, 66 S.Ct. 1014, 90 L.Ed. 1614. The doctrine is applicable only when an issue identical to that presented in the second case has been raised and fully adjudicated under identical and inseparable relevant facts in a prior action between the same parties involving a different tax year. *See* Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Tait v. Western Md. Ry. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405 (1933). We recite the basic facts, fully set forth in our former opinion, for convenience and continuity and to show the inherent similarity of the two cases. *See* Jones v. United States, *supra*, 387 F.2d at 1005–1006.

Prior to 1953, Ruth Jones was the owner of an insurance agency which specialized in accident and health insurance coverage for teachers' groups in Kansas and Missouri. Continental Casualty Company was the underwriter of the group insurance and paid Ruth 22½% of the premiums as commission on group policies which she sold. In 1953, Ruth commenced negotiations with Forrest T. Jones (no relation to the taxpayers) for the sale of her insurance business. Continental apparently played an important role in these negotiations and loaned Forrest the necessary funds for the purchase. The agency was incorporated in furtherance of the sale plans and subsequently Ruth entered into an agreement to sell all of her stock in the agency to Forrest for the sum of $25,000. Approximately three years later the agreement of sale was amended to show that the actual purchase price agreed upon by the parties was $50,000.

---

1. The taxpayers contend that the trial court committed prejudicial and reversible error by: (1) instructing the jury as to the presumptive correctness of assessments made by the Commissioner of Internal Revenue in such a manner as to give that presumption evidentiary value; (2) giving and refusing to give various other instructions, the cumulative effect of which was to deny them a fair trial; and, (3) not allowing counsel to comment, in argument to the jury, on possible tax liabilities of the government's witnesses.

Contemporaneously with the agreement of sale, Ruth entered into the so-called "five per cent agreement" with Continental. Under the terms of this instrument Ruth agreed for a period of ten years "to represent, act and serve as a consultant for Continental on matters relating to the soliciting, negotiating, underwriting and placing of Teachers' Group Insurance as shall be requested by Continental." Continental, in turn, agreed to pay Ruth "for said services a sum equal to 5% of the premiums on any insurance written through Continental by Forrest T. Jones or the Ruth J. Rubel Agency, Inc." Forrest and Ruth also entered into a "guaranty" agreement, whereby Forrest guaranteed to Ruth that the payments received by her under the "five per cent agreement" would not be less than $15,000 per year, and that in the event the payments did not equal that amount in any three consecutive years Ruth would have an option to purchase all of the capital stock of the agency for the sum of $1.00.

Ruth and Paul Jones filed joint income tax returns for the years 1956 and 1957, reporting the payments received by Ruth from Continental pursuant to the five per cent agreement as ordinary income. In 1960 the taxpayers filed a claim for refund, asserting that the amounts reported as ordinary income in the 1956 and 1957 returns were actually deferred payments on the total purchase price of the insurance agency and, thus, taxable as long-term capital gains. On that theory the Internal Revenue Service initially allowed the refund claim in part, but subsequently changed its position, determining that the payments were properly taxable as ordinary income, and instituted the first suit to recover the amount of the refund from the taxpayers.

Ruth and Paul also filed a refund claim for taxes on the payments received during 1958, which had also been reported as ordinary income in their joint return for that year. Again, the I.R.S. originally allowed the refund in part, but later reversed itself and assessed a deficiency. The taxpayers paid this assessment and subsequently filed a second refund claim for the 1958 taxes, which was disallowed.

On their joint returns for 1959, 1960 and 1961, Ruth and Paul reported the payments received during those years as long-term capital gains; thereafter, deficiencies were assessed against them. After paying the assessments, the taxpayers filed another claim for refund, which was also disallowed. Ruth and Paul then instituted two suits, which were consolidated in the present action, claiming to be due refunds totaling approximately $114,000 plus interest, for the years 1958 through 1961.

On trial of the first case the taxpayers argued that the substance of the 1953 transactions was the sale of Ruth's insurance agency to Forrest; that the $50,000 to be paid under the amended agreement of sale was merely a down payment; and, that the five per cent payments were actually installment payments on the total purchase price. The government, on the other hand, contended that Ruth had merely sold her stock in the incorporated agency pursuant to the agreement of sale for a total purchase price of $50,000, and that the five per cent agreement constituted a separate agreement between Ruth and Continental for consulting services. The issue submitted to the jury was whether the amounts received by Ruth from Continental in 1956 and 1957, pursuant to the terms of the five per cent agreement, were part of the sale price of the insurance agency, hence capital gains, or compensation for services rendered, hence ordinary income.

After judgment in the first case, the government made its summary judgment motion on grounds of collateral estoppel in the present case. As we have seen, the trial court denied the motion and submitted the case for trial to a jury. The taxpayers' contentions in the present action were the same as those raised in the prior case and were presented to the jury in substantially the same manner. It is, thus, evident

that this claim is between the same parties as the prior case; arises under the same contractual arrangement; and involves the same contractual payments, except for different taxable years. The applicable tax laws have not changed. It is manifestly clear, therefore, that the legal issues presented in the two cases are essentially identical. The only question then is whether the relevant, tax-operative facts are identical and inseparable for purposes of collateral estoppel. We think so.

■ In rejecting application of collateral estoppel the trial court was apparently influenced by certain alleged dissimilarities in the tax-operative facts of the two cases. First, there was the fact —alluded to in the first case, but more fully developed at the second trial[2]— that Ruth Jones actively participated in business of the insurance agency during the years involved in the first case, whereas she took no active part in agency affairs during the taxable years here in suit. The taxpayers earnestly contend that this dissimilarity justifies, indeed compels, different tax treatment for the five per cent payments received during the various taxable years. Assuming this factual dissimilarity to be true, we think it completely irrelevant to the legal issue presented in both cases and conclusively adjudicated in the prior case; it is simply of no tax consequence.

■ The five per cent agreement provides that Ruth is to receive the payments for acting as a consultant on agency business. And since the payments were continued after she ceased acting as a consultant, it could ordinarily be inferred that those payments were actually made and received for some other reason—*e. g.*, as payments on the purchase price of the going business. We think it highly significant, however, that the five per cent agreement also stated that Continental was required to continue making the payments ". . . regardless of [Ruth's] inability or incapacity to fulfill her obligations hereunder stated and regardless of her death, provided that such obligations have been satisfactorily performed by [Ruth] for a period of two years from the date hereof and prior to any such inability or incapacity or death." Thus, having admittedly satisfied the condition precedent by serving as a consultant for a period of two years from September, 1953, Ruth was entitled to receive the five per cent payments under the terms of the agreement even though no services were actually rendered in the taxable years in question. The issue whether payments made under the terms of the five per cent agreement were ordinary income or capital gains was squarely submitted to the jury in the prior action, and the taxable character of those payments as ordinary income was conclusively established by the verdict. Once the taxable character of payments received pursuant to a contract has been judicially determined, that character cannot be altered as long as the payments continue to be received in accordance with the contract terms and there is no change in the contract or the applicable tax laws. *See* Gillespie v. Commissioner of Internal Revenue, *supra*, 151 F.2d at 906–907.

For substantially the same reason, we think it completely irrelevant that subsequent to 1958, the payments received by Ruth included five per cent of the gross

2. In denying the summary judgment motion, the trial judge noted that Ruth had testified briefly on this point under cross-examination at the first trial, but seemed to think that while such evidence was only of tangential relevance with regard to the 1956 and 1957 tax years, it might have direct bearing with regard to 1958 and subsequent years if further elaboration was permitted at a second trial. "However, as long as the jury in the prior trial had this same evidence before it, the stress placed upon such evidentiary facts by counsel or the court does not matter. This is not a 'subsequent modification of the significant facts.' Commissioner of Internal Revenue v. Sunnen, supra, 333 U.S. [591] at page 599, 68 S.Ct. [715, at page 720, 92 L.Ed. 898]. It is only a change in emphasis." Parker v. Westover, 221 F.2d 603, 605 (9th Cir. 1955).

premiums on accounts not originated by her and as to which she had performed no services. The agreement provided that the annual payments would consist of "5% of the premiums on any insurance written through Continental by Forrest Jones or the Ruth J. Rubel Agency, Inc. . . ." It did not require the premiums to be on accounts which Ruth had personally originated or serviced. The payments in question were, therefore, made pursuant to the contract terms, and the tax treatment to be accorded such payments was conclusively determined in the prior case.

The trial court also relied to a large extent on the taxpayers' assertions that evidence excluded at the first trial would be submitted in admissible fashion in this case so as to present more clearly the issues to be determined and allow them to be more fully litigated, thus creating the distinct possibility of a different verdict. This evidence was primarily intended to establish the agency's true value at the time of the sale and to show that the payments received by Ruth were actually made from funds belonging to Forrest rather than Continental.

■ Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed. *See* Tait v. Western Md. Ry. Co., *supra,* 289

U.S. at 625–626, 53 S.Ct. 706, 77 L.Ed. 1405; Fairmont Aluminum Co. v. C. I. R., 222 F.2d 622, 625, 627 (4th Cir. 1955), cert. denied, 350 U.S. 838, 76 S. Ct. 76, 100 L.Ed. 748; Jones v. Trapp, *supra,* 186 F.2d at 954. "To be sure, we recognize that whenever a court considers applying the doctrine of collateral estoppel, there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence. Without more, however, this question is not sufficient to outweigh the extremely important policy underlying the doctrine of collateral estoppel—that litigation of issues at some point must come to an end." James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 463 (5th Cir. 1971), cert. denied, City Trade & Industries, Ltd. v. Allahabad Bank, Ltd., 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253.

■ After examining and comparing the records in both cases, we are firmly convinced that the relevant facts are identical and inseparable, and that this case clearly comes within the narrow guidelines for application of collateral estoppel in tax litigation. *See* Sunnen v. Commissioner of Internal Revenue, *supra.* We are persuaded, moreover, that application of the doctrine will result in no unfairness to the taxpayers. Even though the trial courts reluctance to grant summary judgment is understandable,[3] the motion for directed verdict was made in the face of all the evidence pertaining to the alleged factual dissimilarities and clearly should have been granted. The judgment in favor of the United States is affirmed for that reason.

---

3. Moreover, in these circumstances an order denying a summary judgment motion is not, in itself, appealable. *See* Goodyear Tire & Rubber Company v. Jones, 433 F.2d 629, 632 (10th Cir. 1970); Boy-les Galvanizing & Plating Co. v. Hartford Acc. & Ind. Co., 372 F.2d 310, 312 (10th Cir. 1967); Annot., 15 A.L.R.3d 899, 922 (1967).