Thomas E. and Margaret S.
SKINNER, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 74-G-673-S.

United States District Court,
N. D. Alabama, S. D.

June 6, 1975.

Drayton Nabers, Jr., and Kirby Sevier, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for plaintiffs.

Wayman G. Sherrer, U. S. Atty., and Charles D. Stewart, Asst. U. S. Atty., Birmingham, Ala., Robert E. Noel, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

### INTRODUCTION

This is an action by Thomas E. and Margaret S. Skinner ("the Skinners") [1] to recover an aggregate sum of $18,614.-90, together with interest as allowed by law, as a refund of federal income taxes which they contend were wrongfully assessed for the years 1970 and 1971. Deficiency assessments for the years in question were based upon a determination by the Internal Revenue Service that certain income reported by the Skinners as long-term capital gain from a sale of stock in Fidelity Service Insurance Company ("Fidelity") was "in substance" compensation for services rendered by Mr. Skinner in connection with a prior sale of Fidelity's assets to United Security Life Insurance Company ("United"). The parties agree that the single issue before this Court is whether such income in fact represents proceeds from a sale of stock, taxable as a capital gain, or compensation taxable as ordinary income.[2] This issue was tried by the Court, sitting without a jury, on May 8, 1975. Having duly considered all of the evidence, the Court makes the following findings of fact and draws therefrom the following conclusions of law.

---

1. The Skinners are citizens of the United States, are over the age of twenty-one years, and are residents and domiciliaries of Birmingham, Alabama. They duly and timely filed their joint federal income tax returns for 1970 and 1971 and paid all taxes shown thereon as owing. Margaret S. Skinner is a party to this case solely because she signed the joint returns. The transactions in question did not directly involve Mrs. Skinner.

2. The parties have stipulated that if plaintiffs are entitled to capital gains treatment on the income at issue, the amount of the refund due plaintiffs is $18,614.90, plus interest at the rate of 6% per annum on $13,242.71 from April 15, 1971 and on $5,372.19 from April 15, 1972.

## FINDINGS OF FACT

A. *The Skinners' Acquisition of Fidelity
   Stock and United's Acquisition
   of Fidelity's Business*

1. *The Structuring of the Transaction*

In early 1962 and for many years prior thereto, E. Brooks Glass, Jr. ("Glass") owned all of the outstanding stock (1000 shares) of Fidelity Service Insurance Company ("Fidelity"). On March 30, 1962, Glass gave an option to the Skinners, or their nominee, to purchase his stock for $1,500,000 on or before June 5, 1962.[3] (Plaintiffs' Exhibit 2).

Although the Skinners felt that the Fidelity stock was worth considerably more than Glass' $1,500,000 asking price, they were not in a financial position to exercise their option immediately. Instead, in the spring of 1962, Mr. Skinner publicly announced, both through advertisement in the Wall Street Journal and by word of mouth to various representatives of the insurance industry, that he and his wife were offering to sell Fidelity at a price of $2,500,000.[4] Numerous inquiries were received by the Skinners regarding this offer, and in May of 1962, two unrelated prospective purchasers—Mr. James S. Shively ("Shively") of Houston, Texas and United Security Life Insurance Company ("United") of Birmingham, Alabama—each advised Mr. Skinner that they were willing to pay his asking price for Fidelity. After extensive negotiations with both Shively and United, the Skinners decided to sell to United in late May of 1962.

At that time United was conducting an expansion program, which was designed to reduce its overhead expense per dollar of business. Because of this program, United was unable to pay cash to the Skinners for Fidelity. Through its president, Nolan C. Aspinwall ("Aspinwall"), and its certified public accountant, Jack S. Parrish ("Parrish"), United structured the transaction as follows:

> United would reinsure all of Fidelity's business, taking over all of Fidelity's assets except the home office building, Fidelity's deposit with the State of Alabama, and approximately $1,-385,000 of marketable securities. Fidelity would then use the $1,385,000 of securities to redeem 750 shares of Glass' 1000 shares of Fidelity stock. The Skinners would then pay Glass approximately $115,000 for his remaining 250 shares of Fidelity stock, resulting in Glass' receiving total consideration worth $1,500,000 for his stock. In addition, United would agree to pay Fidelity a small override of 2% of its gross premium income on industrial business in excess of $9,000 over a period of 20 years, said override not to be less than $25,000 nor more than $40,000 per year. This would result in giving the Skinners approximately their asking price for the business.

Because the acquisition of Fidelity's business created a strain on United's surplus, Aspinwall and Parrish formulated the foregoing structure for the transaction to minimize the strain and presented it to Mr. Skinner for his ap-

---

3. Several months prior to Glass' giving the stock option to the Skinners, Mr. Skinner had expressly advised Glass that any dealings between them with respect to the Fidelity stock would have to be at arm's length and that Glass should retain independent legal counsel. (Plaintiffs' Exh. 1).

4. From the evidence before the Court, it appears that the actual market value of the Fidelity stock in May of 1962 was in the neighborhood of $2,500,000. For example, the affidavit of insurance actuary, John A.

Copeland, Jr., which was admitted into evidence without objection by the Government, states that Fidelity was worth $2,464,481 as of December 31, 1961 and $2,530,000 as of May 28, 1962. (Plaintiffs' Exh. 10). Moreover, as noted above, two independent prospective purchasers made bona fide offers to pay consideration worth approximately $2,500,000 for Fidelity in May of 1962. With respect to a closely held business, such offers would ordinarily establish its fair market value. *E. g., Julius H. (Groucho) Marx*, 29 T.C. 88, 100 (1957).

proval. Ultimately both the Skinners and Glass found this structure to be acceptable and acquiesced therein.

### 2. The Reinsurance Agreement and Override Agreement of May 28, 1962

United, through Aspinwall and Parrish, suggested that two contracts be prepared to carry out their plan for acquiring Fidelity's business. The two contracts that were ultimately prepared are referred to descriptively herein as the "Reinsurance Agreement" and the "Override Agreement."

On May 28, 1962, a meeting was held in the offices of Fidelity for the purpose of executing the Reinsurance and Override Agreements. In attendance were Mr. Glass, president of Fidelity; his wife; Mr. and Mrs. Skinner; Mr. Aspinwall, president of United; Mr. William DeLong, vice-president of United; and Messrs. Mackle, Eldredge, and Parrish, accountants for United.

At the May 28 meeting, Fidelity and United executed the Reinsurance Agreement, and United executed the Override Agreement.[5] The Reinsurance Agreement provided in substance that all of the assets of Fidelity, except for certain assets including marketable securities valued at $1,385,000, would be transferred to United and that United would assume all of Fidelity's obligations, including policy obligations and reserve liabilities, subject to approval by the Alabama Department of Insurance. (Plaintiffs' Exh. 3). The Override Agreement provided that United would pay as additional consideration for the purchase of Fidelity's business 2% of its gross premium income on industrial business in excess of $9,000 for a period of 20 years, with a minimum guaranteed payment of $25,000 and a maximum of $40,000 per year, subject to approval by the Department of Insurance. (Plaintiffs' Exh. 4).

It is the May 28 Override Agreement, the facts surrounding its execution, and the inferences to be drawn therefrom, which give rise to the controversy in this case. The Skinners contend that this was a bona fide contract between Fidelity and United for the payment to Fidelity of additional consideration for the sale of its assets to United. The Government urges that the Agreement was intended by United to provide compensation to the Skinners for services rendered by Mr. Skinner in arranging the sale of Fidelity's assets to United. The Government further contends that the Skinners' eventual sale (discussed hereinafter) of the Fidelity stock that they acquired on May 28 was merely an attempt to disguise ordinary income as long-term capital gain. The Court finds that the Skinners have unquestionably sustained their burden of proof, not only by a preponderance of the evidence but by the great weight of the evidence, and that such evidence as there is in the record to support the inferences urged by the Government is so tenuous as not to be credited, all for the reasons hereinafter stated.

### 3. The Purpose and Operational Effect of the May 28 Agreements

The two-contract structure for the May 28, 1962 transaction was solely the idea of United. In formulating this structure, it was United's hope that by segregating the 2% override into a separate instrument it might persuade the

---

5. The Government points to the fact that only United signed the Override Agreement as an indication that the Agreement was concealed from Fidelity, or from its president, Mr. Glass, and that therefore it was not bona fide consideration passing to Fidelity in exchange for its business. The Court finds, however, that the fact that Fidelity did not sign the Override Agreement is clearly of no consequence inasmuch as that Agreement was unilateral in the sense that it imposed contractual obligations only on United. It is normal, of course, that a promisee under a unilateral agreement not sign the same, especially when two documents form one overall agreement. In fact, the Statute of Frauds requires the signature only of "the party to be charged." Ala.Code tit. 20, § 3 (Recomp. 1958). Accord Ala.Code tit. 3A, § 2–201 (Addit.Vol.1966).

State Department of Insurance to treat only the amount of override owing Fidelity in any one year (i. e. a maximum of $40,000) as a present liability on its balance sheet. Had United been required to reflect the entire 20-year override indebtedness (i. e. between $500,000 and $800,000) as a current liability, its accountant feared that its surplus would have been impaired and its expansion program effectively ended.

Although Aspinwall and Parrish alone structured the May 28 transaction, Mr. Skinner and Aspinwall negotiated at length the specific amount of consideration to pass to Fidelity for its business, the period of time for payment of this consideration, and the security for any long-term debt of United. At the time of these negotiations, the Skinners, of course, possessed a very real interest in Fidelity by virtue of their option to purchase all of Glass' stock. Moreover, since the Skinners were to become the sole stockholders of Fidelity under the May 28 transaction as structured by United, it was up to them, rather than Glass, to maximize the consideration flowing to Fidelity on the transaction.

■ The entire transaction between United and Fidelity of May 28, 1962 was embodied in the Reinsurance and Override Agreements. These two agreements speak plainly for themselves as to their true purpose and effect. There were no side agreements of any type concerning the payment of compensation to the Skinners in connection with the transaction. The Override Agreement was never intended to provide, and did not in fact provide, any brokerage fee, commission, or compensation of any kind to Mr. Skinner.[6] Rather, the 2% override was simply additional consideration which United had to pay Fidelity to meet the Skinners' asking price for Fidelity's business. The May 28 transaction was at all times discussed solely as one by which United would acquire Fidelity's business, and no arrangement concerning the payment of any form of compensation, express or implied, was considered or contemplated by the parties.[7]

■ In support of its position that the Override Agreement of May 28 was intended to provide compensation to the Skinners, the Government contends that Mr. Glass, as president of Fidelity, had no knowledge of the Agreement at the time of its execution and that hence the 2% override could not possibly have constituted consideration passing to Fidelity for the sale of its assets. While this Court does not by any means consider the matter of Glass' prior knowledge (or lack thereof) of the Override Agreement determinative of the tax issue involved in this case, it is convinced by the evidence presented, and so finds, that Mr.

---

6. The evidence conclusively dispels any possibility of an agency, brokerage, or employment relationship between Mr. Skinner and United in May of 1962.

7. All of the foregoing findings are convincingly supported by the testimony of Mr. Parrish and Mr. Skinner, by Plaintiff's Exhibit 7 (discussed in footnote 8 *infra*), and by the contractual documents themselves. (Plaintiffs' Exhs. 3 & 4). The testimony of Mr. Parrish is especially persuasive since he has no interest whatsoever in this litigation, has no personal connection with the plaintiffs or defendant, and is a very sick man, having suffered a series of heart attacks and having been too ill to testify at trial without endangering his health. Mr. Parrish's testimony was forthright and nonevasive. The Court has no reason to believe that he would testify other than truthfully, and the circumstances indicate that his testimony should be given full credit. While Mr. Skinner's testimony may be considered to be that of an interested party, nevertheless he testified in the presence of the Court, was straightforward and nonevasive, and his candor and demeanor were that of a believable witness. If it may be argued that his testimony was self-serving, the same can be said for that of Mr. Glass, given by a 1967 deposition from other ligitation, which has been admitted into evidence over the objection of plaintiffs. The testimony of Mr. Glass was purely self-serving. It is supported by no testimony from any other witness, is discredited by Mr. Parrish's testimony (see especially pp. 27–30 of Parrish's deposition), and is contradicted in material respects by the documentary evidence on file.

Glass well knew of the Agreement both prior to and at the time of its execution. The evidence reflects, for example, that prior to May 28, 1962, Mr. Glass had been given copies of both the Reinsurance and Override Agreements, had reviewed the same with Mr. Skinner, and had advised Mr. Skinner that he (Glass) had consulted his attorney and tax advisor concerning the same. Moreover, Mr. Glass had copies of both agreements in his possession at the May 28 meeting where they were executed, and both agreements were openly discussed both by Mr. Glass and by others in his presence during the meeting. Both agreements were subject to approval by the State Department of Insurance, and following their execution Mr. Glass requested that his copies of the same bear the stamp of approval of the Superintendent of Insurance and be returned to him. Both agreements were thereafter approved by the Superintendent of Insurance on May 29, and approved copies were given to the various parties. Copies of the two agreements also became a part of the public records of the Department of Insurance, as well as the corporate minutes of United. In short, the evidence makes crystal clear that all interested parties were fully aware of both May 28 agreements at the time of their execution [8] and that neither was intended to provide, or in fact provided, for payment of compensation to the Skinners.

Following the execution of the two May 28 agreements, and in accordance with the structure of the transaction as dictated by United, the Skinners, on May 29, 1962, purchased 250 shares of Fidelity stock from Glass for approximately $115,000. Also on May 29, all officers and directors of Fidelity resigned. On May 30, a resolution was adopted authorizing the redemption and cancellation by Fidelity of the remaining 750 shares of Glass' Fidelity stock for securities valued at approximately $1,385,000. The net result of the agreements of May 28 and steps taken pursuant thereto was that the Skinners became the sole stockholders of Fidelity,[9]

---

8. Both Mr. Parrish and Mr. Skinner have unequivocally testified that Mr. Glass knew of the Override Agreement at the time of its execution. Plaintiffs urge, in addition, that their Exhibit 7 solidly corroborates the testimony of Parrish and Skinner on this point. Plaintiffs' Exhibit 7 is a "joint statement" prepared and signed on each page by Mr. Glass and Mr. Skinner on September 20, 1962, concerning the facts surrounding the May 28 transaction. The Government contends that this "joint statement" fails to indicate prior knowledge on Glass' part of the Override Agreement. The "joint statement" contains the following paragraph on page 3:

"After the confirmation of the above referred to agreements, the only assets which were to remain in the name of Fidelity were those bonds on deposit with the State of Alabama, the Home Office Building of Fidelity and a two percent override contract on all industrial business written by United for a period of twenty years with the maximum guarantee for any one year of $40,000.00. *Glass was fully informed as to all of these facts by Skinner.*" (emphasis added).

This paragraph is situated between two other paragraphs which refer specifically to the details of the closing of the May 28 transaction. The position of this paragraph in the instrument would clearly appear to indicate that the last sentence thereof was intended to say that "Glass was fully informed as to all of these facts," including the existence of the Override Agreement, at the time of the May 28 closing. Obviously the mere fact that the "joint statement" does not explicitly state that the Override Agreement was part of the consideration flowing to Fidelity is unimportant. It does refer to the Agreement's existence, implying that it was a part of the transaction, and indicating that "Glass was fully informed." It was entirely unnecessary and, indeed, would have been miraculous for a statement dictated months after the transaction to have recited all of the relevant facts without ambiguity. If the above-quoted paragraph is ambiguous, which the Court does not believe it to be, the ambiguity has certainly been removed by the Court's firm conviction and finding, based on *all* the relevant evidence, that Mr. Glass well knew of the Override Agreement at the time of its execution.

9. The May 28 transaction clearly involved an exercise by the Skinners, or their nominee, of the option of March 30, 1962. The Court is unimpressed with the Government's argument that the transaction in no manner con-

United became the owner of all Fidelity's business, and Glass' interest in Fidelity was terminated for his asking price of $1,500,000.

### B. The Skinners' Sale of Fidelity Stock to United

#### 1. The Structuring of the Transaction

At the time the Skinners acquired the stock of Fidelity, there was no agreement or understanding whatsoever that United would ever purchase the stock from them. In July or August of 1962, however, Aspinwall initiated negotiations with Mr. Skinner for the purchase by United of all of the Fidelity stock.

There were basically three reasons why United desired to acquire the Skinners' Fidelity stock. First, and of foremost importance, the State Examiner for the Insurance Department had taken the position that the entire indebtedness of up to $800,000 owing Fidelity under the Override Agreement of May 28 had to be treated as a current liability by United.[10] Second, in furtherance of United's expansion program, Aspinwall had determined to buy the industrial business of Emergency Aid Insurance Company, which would have increased the amount due Fidelity under the Override Agreement to the maximum of $40,000 annually. Third, United was interested in obtaining the Fidelity charter, which it considered to be of considerable value.

All negotiations between Skinner and Aspinwall concerning the possible sale of the Skinners' Fidelity stock were conducted completely at arm's length, Skinner at all times undertaking to get the most for the stock and United seeking to pay as little as possible therefor. In the late summer of 1962, the negotiations culminated in an agreement by which United was to purchase the Skinners' stock by making a substantial down payment and by paying the balance over a period of 234 months. J. Haran Lowe ("Lowe"), attorney for United, and Mr. Skinner initially drafted a single agreement embodying the terms of the purchase. This agreement was then submitted to Aspinwall who thereupon instructed Lowe to separate the agreement into two distinct contracts, one covering the down payment and the other the installment payments. The use, once again, of two agreements when one would have been legally sufficient, again at the insistence of United,[11] reinforces the Court's finding that the use of two agreements in May had been intended for United's benefit and that there had been no untoward motive on the Skinners' part and especially no intention on their part to conceal one of the agreements from Mr. Glass. By the time this second two-agreement transaction had been structured by United, Mr. Glass was entirely out of the picture.

#### 2. The Down Payment Agreement and Installment Payment Agreement of September 6, 1962

Under instructions from Aspinwall, Skinner and Lowe drafted the two contracts covering the sale of the Skinners'

---

formed to the requirements of the option agreement. Parties to such an agreement have a perfect right to agree mutually to a different form of closing than that prescribed by the strict terms of the agreement. That is what took place here, and the Skinners ended up as owners of all the stock of Fidelity.

10. The Department's position was based upon the fact that the Override Agreement created a lien on all the industrial business to be written by United to secure the monthly override payments. It was United's hope and belief that, by purchasing the Skinners' Fidelity stock primarily through the use of long-term installment indebtedness, it would be able to significantly reduce the charge to surplus resulting from the Insurance Department's treatment of the Override Agreement.

11. As Mr. Parrish testified, he suggested that United use two contracts in acquiring the Skinners' Fidelity stock on the theory that this might assist United in persuading the State Department of Insurance to treat only the consideration payable under the "Down Payment Agreement" as a current liability, chargeable against the company's surplus.

Fidelity stock to United. These contracts are conveniently referred to herein as the "Down Payment Agreement" and the "Installment Payment Agreement." Although both agreements were executed on September 6, 1962, both make clear that the sale of stock was to take place on December 5, 1962.

Under the Down Payment Agreement, United agreed to make two payments to the Skinners, one for $70,000 on December 5, 1962, and one for $293,000 on January 2, 1963. (Plaintiffs' Exh. 5). Under the Installment Payment Agreement, United agreed to pay the Skinners $702,000 payable monthly beginning January 5, 1963, at the rate of $3,000 per month for 234 months without interest. (Plaintiffs' Exh. 6). Both the Down Payment Agreement and Installment Payment Agreement were authorized and approved by resolutions of the board of directors of United dated September 6, 1962. It is the $3,000 monthly payments being received by the Skinners under the Installment Payment Agreement that the I.R.S. presently contends constitute compensation, taxable as ordinary income.

### 3. *The Purpose and Operational Effect of the September 6 Agreements*

The two-contract structure for the September 6, 1962 sale of stock by the Skinners to United was formulated entirely by United. It was United's hope that by so structuring the purchase, the Alabama Department of Insurance would not treat the installment payments as a current liability of United.

Although the structure for the sale of stock was dictated by United, Mr. Skinner and Aspinwall negotiated extensively and at arm's length as to the sales price and specific terms of payment. Throughout these negotiations Skinner's sole objective was to maximize the consideration flowing to him and his wife for their stock, and Aspinwall's objective was for United to pay as little as possible for the stock.

The evidence before the Court indelibly establishes (a) that there was no agreement whatsoever that Mr. Skinner would act on behalf of United in arranging or effecting any part of either the May 28 or September 6 transactions; (b) that Skinner acted at all times at arm's length with United, seeking always to further his and his wife's financial interests; (c) that United never consented to Skinner's acting on its behalf in any transaction and that Skinner never consented to act on United's behalf; (d) that Skinner was given absolutely no authority to bind United in any transaction; (e) that United never had, nor attempted to exercise, any power of control over Skinner at any time; and (f) that no agreement between Skinner and United was intended to provide, or in fact provided, any brokerage fee, commission, or compensation of any kind to the Skinners. In short, the contracts of September 6, 1962 embodied the entire agreement concerning the Skinners' sale of their Fidelity stock to United. There was no relationship, formal or informal, between the Skinners and United other than that of seller and purchaser.[12]

### C. *The I.R.S. Audits of the Transactions*

In the years following the sale of the Skinners' Fidelity stock to United, the Skinners treated all income realized from the sale as long-term capital gain on their joint tax returns. On three separate occasions the I.R.S. audited the Skinners' returns and questioned their capital gain treatment of this income. The first audit occurred in 1965 and resulted in a categoric determination by the I.R.S. that all income from the sale had been properly reported as long-term capital gain. The second audit occurred in 1967 and resulted in the same determination by the I.R.S. The final audit occurred in 1972, and this time the I.R.S. abandoned its earlier position and concluded that the proceeds of

---

12. These facts are made inescapable by the testimony of Mr. Skinner and Mr. Parrish (see footnote 7 *supra*) and are supported by the contractual documents themselves. (Plaintiffs' Exhs. 5 & 6).

the Installment Payment Agreement represented "compensation in substance," taxable as ordinary income.[13]

As previously noted, the single issue presented to this Court as a result of the 1972 audit is whether the income in question represents proceeds from the sale of stock, taxable as a capital gain, or compensation, taxable as ordinary income.

## CONCLUSIONS OF LAW

The Court has jurisdiction of this action under the provisions of 28 U.S.C.A. § 1346 and 26 U.S.C.A. § 7422. Venue is properly laid in this Court under the provisions of 28 U.S.C.A. § 1402(a)(1).

■ It is well settled that an income tax deficiency assessment by the I.R.S. is presumed to be correct and that a taxpayer maintaining a suit for refund has the burden of showing that he has been overtaxed. *E.g., Mersel v. United States,* 420 F.2d 517, 518 (5th Cir. 1969); *Pinder v. United States,* 330 F.2d 119, 124 (5th Cir. 1964). In the present case plaintiffs have unquestionably sustained their burden of proof and have demonstrated beyond any question that the I.R.S. assessment concerning the income at issue was patently erroneous and unfounded.

■ The settled legal standards for distinguishing proceeds of a sale of stock from compensation for tax purposes have been fully and cogently discussed by various tribunals. *E. g., Fletcher v. United States,* 303 F.Supp. 583, 591–94 (N.D.Ind.1967), *aff'd,* 436 F.2d 413 (7th Cir. 1971); *Julius H. (Groucho) Marx,* 29 T.C. 88, 99–100 (1957); *Jack Benny,* 25 T.C. 197, 208–11 (1955). *See also* Rev.Rul. 59–325, 1959–2 Cum.Bull. 185; 1 J. Mertens, *Law of Federal Income Taxation* § 6.04 (1974). Under the teaching of these authorities, all income at issue in this case clearly and undeniably represents proceeds of a sale of stock, properly taxable as long-term capital gain to plaintiffs.[14]

13. The sole basis for the I.R.S.'s position in its 1972 audit was language in a decision by the Tax Court in *Estate of E. Brooks Glass, Jr.,* 55 T.C. 543 (1970). The *Glass* case involved the question of the liability of Mr. Glass' estate for income taxes owed by Fidelity on gain realized as a result of the sale of its business to United on May 28, 1962. One of the several sub-issues raised before the Tax Court was the amount of gain realized by Fidelity on the sale. In an effort to minimize this gain, Mr. Glass testified that he had had no knowledge of the 2% Override Agreement of May 28 at the time of its execution and that the Agreement was accordingly intended as a broker's fee to Mr. Skinner, rather than as consideration to Fidelity. On the basis of Glass' testimony, the Tax Court concluded that the Override Agreement did not represent consideration to Fidelity; it thereafter expressly left open the question of whether the Agreement was ultimately transformed into a broker's fee for Mr. Skinner in the form of the $3,000 per month Installment Payment Agreement of September 6, 1962. 55 T.C. at 570, 571. This Court finds that the language of the Tax Court in *Glass* is not controlling and is of little import in resolving the issue at hand because (1) the Skinners were neither parties nor witnesses to the *Glass* suit; (2) the issue *sub judice* was expressly and necessarily left open by the Tax Court; (3) the record of the *Glass* decision was substantially incomplete for resolving such issue; and (4) as a matter of settled law, the language of the *Glass* opinion can be viewed only in light of the record before the Tax Court and cannot be invoked upon the dramatically different record before this Court. *E. g., Edlin v. Firemen's Ins. Co.,* 225 F.2d 80, 82 (7th Cir. 1955); *United States v. Davidson,* 139 F.2d 908, 911 (5th Cir. 1943). *Accord Armour v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *Krieger v. Bausch,* 377 F.2d 398, 401 (10th Cir. 1967). As previously noted, the evidence before this Court establishes that Glass had knowledge of the Override Agreement both prior to and at the time of its execution. However, completely aside from the issue of Glass' knowledge of the Override Agreement, this Court would, on the record before it, have no alternative but to conclude that the income at issue represents exclusively proceeds from the sale of a capital asset, taxable as long-term capital gain. (See authorities cited under "Conclusions of Law.")

14. As earlier indicated, this Court believes that plaintiffs are entitled to capital gains treatment on the income at issue under the above-cited authorities completely indepen-

Indeed, the evidence establishing plaintiffs' right to capital gains treatment here appears stronger and more conclusive than the evidence relied upon by the courts to reach the same result in favor of taxpayers in each of the above-cited cases.

Plaintiffs are accordingly entitled to recover of defendant a refund of federal income taxes in the amount of $18,614.-90, together with interest at the rate of 6% per annum on $13,242.71 from April 15, 1971 and on $5,372.19 from April 15, 1972.[15] All costs of court incurred in this action will be taxed to defendant.

dent of any consideration of Mr. Glass' prior knowledge of the Override Agreement of May 28, 1962. However, for the record, the Court again reiterates its conclusion that, under the evidence on file, Mr. Glass clearly did have knowledge of the Override Agreement both prior to and at the time of its execution.

15. Because plaintiffs will continue to receive payments of $3,000 per month under the Installment Payment Agreement of September 6, 1962 for several more years, and because plaintiffs have already been besieged with I. R.S. audits concerning these payments, the Court is constrained to direct the parties' attention to the decision in *Jones v. United States*, 466 F.2d 131 (10th Cir. 1972).

There, in invoking the doctrine of collateral estoppel to bar relitigation of the issue of whether payments received by a taxpayer under a long-term installment contract constituted "compensation" or "proceeds of a sale of stock," the Court stated and applied the following salutary rule:

"Once the taxable character of payments received pursuant to a contract has been judicially determined, that character cannot be altered as long as the payments continue to be received in accordance with the contract terms and there is no change in the contract or the applicable tax laws." 466 F.2d at 135.

The *Jones* decision appears entirely sound and in line with the general authorities in the area.