# United States Court of Appeals
# for the Federal Circuit

---

**INTELLECTUAL VENTURES I LLC,
INTELLECTUAL VENTURES II LLC,**
*Plaintiffs-Appellees*

**INVENTION INVESTMENT FUND II, LLC,
INTELLECTUAL VENTURES MANAGEMENT, LLC,
INVENTION INVESTMENT FUND I, L.P.,**
*Third Party Defendants-Appellees*

**v.**

**CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), NATIONAL
ASSOCIATION, CAPITAL ONE, NATIONAL
ASSOCIATION,**
*Defendants/Third Party Plaintiffs-Appellants*

---

2018-1367

---

Appeal from the United States District Court for the District of Maryland in No. 8:14-cv-00111-PWG, Judge Paul W. Grimm.

---

Decided: September 10, 2019

---

ROBERT E. FREITAS, Freitas & Weinberg LLP, Redwood City, CA, argued for plaintiffs-appellees and third party defendants-appellees. Also represented by JESSICA N. LEAL,

DANIEL J. WEINBERG.

MATTHEW J. MOORE, Latham & Watkins LLP, Washington, DC, argued for defendants/third party plaintiffs-appellants. Also represented by GABRIEL BELL, ALAN J. DEVLIN, ADAM MICHAEL GREENFIELD; ALEXANDER REICHER, CHRISTOPHER S. YATES, San Francisco, CA; ROBERT A. ANGLE, Troutman Sanders LLP, Richmond, VA.

MICHAEL MURRAY, Antitrust Division, United States Department of Justice, Washington, DC, argued for amicus curiae United States. Also represented by FRANCES ELISABETH MARSHALL, MAKAN DELRAHIM, ANDREW C. FINCH, JAMES FREDRICKS, KRISTEN CEARA LIMARZI, ROBERT NICHOLSON, MARY HELEN WIMBERLY.

MARK STEPHEN HEGEDUS, Office of General Counsel, Federal Trade Commission, Washington, DC, for amicus curiae Federal Trade Commission. Also represented by ALDEN F. ABBOTT, JOHN DUBIANSKY, JOEL MARCUS, SUZANNE MUNCK AF ROSENSCHOLD, HAIDEE L. SCHWARTZ.

———————————

Before PROST, *Chief Judge,* BRYSON and REYNA, *Circuit Judges.*

BRYSON, *Circuit Judge.*

This appeal stems from a patent infringement action brought in 2014 in the District of Maryland before Judge Paul W. Grimm. The action was instituted by Intellectual Ventures I LLC and Intellectual Ventures II LLC against Capital One Financial Corporation and two other affiliated companies: Capital One (Bank) USA, National Association; and Capital One, National Association (collectively "Capital One"). The action in this case was preceded by a similar patent infringement action brought by Intellectual Ventures I LLC and Intellectual Ventures II LLC in 2013 against Capital One in the Eastern District of Virginia

before Judge Anthony J. Trenga.  The infringement claims in both cases were resolved against Intellectual Ventures I LLC and Intellectual Ventures II LLC, first by the two trial courts and then on appeal.  *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, Civil Action No. 1:13-cv-00740, 2014 WL 1513273 (E.D. Va. Apr. 16, 2014), *aff'd*, 792 F.3d 1363 (Fed. Cir. 2015); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 127 F. Supp. 3d 506 (D. Md. 2015), *aff'd*, 850 F.3d 1332 (Fed. Cir. 2017).

In both cases, Capital One filed antitrust counterclaims against Intellectual Ventures I LLC and Intellectual Ventures II LLC, and it filed third-party antitrust complaints against three other companies affiliated with IV: Invention Investment Fund II, LLC; Intellectual Ventures Management, LLC; and Invention Investment Fund I, L.P.[1]  In both cases, the counterclaims and third-party claims were resolved against Capital One. The district court in the Virginia case dismissed Capital One's antitrust counterclaims and third-party claims for failure to state a claim on which relief could be granted. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-cv-00740, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ("Trenga Op.").  The district court in the instant case initially granted Capital One's motion to add antitrust counterclaims and third-party claims to the Maryland case, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 99 F. Supp. 3d 610 (D. Md. 2015), and denied IV's motion to

---

[1]    For simplicity, the term "IV" will be used to refer both to the two plaintiff companies (Intellectual Ventures I LLC and Intellectual Ventures II LLC) and to the group consisting of the two plaintiff companies and the three affiliated third-party defendant companies (Invention Investment Fund II, LLC; Intellectual Ventures Management, LLC; and Invention Investment Fund I, L.P.).

dismiss those claims, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. PWG-14-111, 2015 WL 4064742 (D. Md. July 1, 2015). However, the court subsequently granted summary judgment against Capital One on all the antitrust claims. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691 (D. Md. 2017). We affirm.

I

A

In the Virginia case, IV asserted five patents against Capital One. After the plaintiffs dropped two of the patents, three patents remained in issue. The first was directed to tracking and storing information relating to a user's purchases and expenses. The second was directed to methods and systems for providing customized Internet content to a user as a function of user-specific information and the user's navigation history. The third was directed to methods of scanning hardcopy images onto a computer.

In its answer, counterclaims, and third-party claims in the Virginia case, Capital One alleged antitrust violations and claimed patent misuse as a defense. In the antitrust counterclaims and third-party claims, Capital One alleged that IV was liable for monopolization and attempted monopolization, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and unlawful acquisition of assets, in violation of section 7 of the Clayton Act, 15 U.S.C. § 18.

Capital One alleged in the Virginia case that IV, which is principally engaged in the business of acquiring patents and asserting them in litigation, had acquired a huge patent portfolio, including approximately 3,500 patents relating to commercial banking practices. According to Capital One, IV's business model was to attempt to obtain large licensing fees from banks by threatening them with repetitive patent infringement suits. Capital One alleged that IV concealed the identity of its patents and insisted

that banks such as Capital One take a license to IV's entire portfolio of patents on financial services. Capital One contended that IV knew that many of its patents were invalid, unenforceable, and not infringed. Nonetheless, according to Capital One, IV sought to obtain licensing fees based on the large size of its patent portfolio and its willingness to pursue target banks, including Capital One, through serial lawsuits, imposing huge costs on the banks to defend the lawsuits. Capital One alleged that IV's business model "is not based on the licensing of valuable patent rights, but rather on the threat of asserting thousands of patents in a never-ending series of costly and disruptive patent infringement law suits—pummeling its victims into submission." Answer to Complaint at 12, No. 1:13-cv-00740, at 12 (E.D. Va. Oct. 14, 2013).

Capital One alleged that IV implemented its scheme through "sham infringement litigation in bad faith, regardless of the relevance, validity, or enforceability of its patents or the likelihood of success on the merits at trial, with the intent of using the federal court process, as opposed to the  outcome of that process, as an anti-competitive weapon to increase its pricing power in the relevant market." *Id.* at 31. As a result of IV's tactics, Capital One alleged, "a rational financial services target would more likely than not pay for limited patent peace, even if [IV] does not have a single valid and infringed patent in its financial services portfolio." *Id.* at 16.

IV moved to dismiss the antitrust counterclaims in the Virginia case, and Judge Trenga granted the motion. Capital One alleged in the Virginia case that the relevant market for antitrust analysis was the "market for technology enabling business processes common throughout the commercial banking industry in the United States." *Id.* at 13. The court, however, concluded that Capital One had not alleged "any of the recognized indicia of a relevant market." Trenga Op. at *5. In particular, the court noted that Capital One did not allege that the

proposed market consisted of "an 'area of effective competition' between IV and the commercial banks who are the alleged victims of IV's anticompetitive conduct." *Id.* Capital One also did not allege that the proposed market "contains all, or even any, of the available substitutes for the technologies included within that proposed market, or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case." *Id.* With respect to the market definition issue, the court concluded that "as best as the Court can discern, Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents an 'inescapable threat' to providers of financial services." *Id.*

The Virginia court observed that because Capital One had in effect alleged that there is no commercial market for IV's patent portfolio, Capital One's relevant market "reduces to what IV relies upon to justify its allegedly extortionate demands to buy 'patent peace' and avoid the paralyzing costs of 'wave after wave of burdensome and expensive litigation.'" *Id.* For that reason, the court concluded, "the actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio. Only in that sense are there no 'substitutes' for the patents that IV controls and uses to threaten and coerce the commercial banks." In short, the court concluded, "Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." *Id.*

Even assuming that Capital One had proposed an appropriate "relevant market" consisting of the market for

technologies used to provide commercial banking services in the United States, the Virginia court concluded that Capital One had failed to allege facts that rendered plausible its claim that IV wields unlawful monopoly power within that market. Capital One did not allege that IV had any particular share of that market, but instead relied on what it characterized as "direct evidence" of market power in the form of "supracompetitive prices and restricted output." *Id.* at 6. But the court concluded that Capital One had not identified any evidence from which to infer that the licensing fees proposed by IV were supracompetitive or that the demanded licensing fees reflected unlawful monopoly power within the context of IV's right to license its patents. *Id.* The court added that Capital One did not explain how threats of litigation to enforce presumably valid patents can render license fees unlawful if they would otherwise be lawful. *Id.*

The Virginia court also found that Capital One's counterclaims and third-party claims did not include any allegation that IV sought to foreclose competition, to gain a competitive advantage, or to destroy a competitor. *Id.* at *7. Moreover, the court found, the counterclaims and third-party claims contained no fact-based explanation of why IV's acquisition of presumably valid patents was unlawful or at what point IV's enforcement of multiple patents became an unlawful exercise of monopoly power. *Id.*

A central feature of Capital One's theory of monopolization, the Virginia court explained, was that "IV has engaged in or threatens to engage in, 'sham litigation' to enforce a patent portfolio whose patents are, in fact, either unenforceable or so weak that, absent IV's 'hold-up,' they have limited commercial value." *Id.* The court noted, however, that Capital One had not referred to any specific litigation history to support that claim or identified any particular patents that IV "has attempted or threatened to enforce that have expired, been cancelled or adjudicated to

be invalid." *Id.* And because IV and Capital One do not compete in any relevant market, the court concluded that "it cannot be said that IV's object is to use this or any other litigation to interfere with the business relationships of a competitor." *Id.*

Under those circumstances, the Virginia court held, Capital One has not alleged facts that would plausibly place this litigation within any recognized exception" to the so-called *Noerr-Pennington* doctrine, which—with limited exceptions—protects private parties from antitrust liability based on even unsuccessful litigation attempts to enforce laws with potentially anti-competitive effects. *Id.* (citing *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)).

In the end, the court stated, "Capital One's claim of monopolization reduces simply to IV's alleged ability, with its economic resources and patent portfolio, to credibly threaten serial litigation, not for the purpose of enforcing its patents, but rather to bludgeon Capital One into a licensing agreement that could not otherwise be obtained or justified based on the merits of its patents, were they to be dispersed individually among many holders." Trenga Op. at *7. If IV were to engage in the kind of endless, unsuccessful litigation described by Capital One, the court added, IV would be likely to incur legal liability. But "the antitrust laws appear ill suited as a remedy for what Capital One fears, and relief for any such liability would more likely come through various doctrines of tort liability, statutory fees or judicial sanctions." *Id.* at *8.

With respect to Capital One's Clayton Act claim, the Virginia court noted that section 7 of the Clayton Act can apply to the acquisition of patents, as it does to the acquisition of other assets, but only if the acquisition of the patents itself substantially lessens competition, and not where the anticompetitive effects arise after the

acquisition. Because Capital One alleged that the anticompetitive effects arose from IV's litigation threats and not from the patent acquisitions themselves, the court held that Capital One had failed to allege any facts that made it plausible that the effect of IV's patent acquisition "may be to substantially lessen competition." *Id.* at *9.

With respect to IV's patent infringement claims against Capital One, the Virginia court subsequently held that two of the three litigated patents were directed to ineligible subject matter. As to the third, the court issued a claim construction that resulted in the parties' stipulating to non-infringement. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-cv-00740, 2014 WL 1513273 (E.D. Va. Apr. 16, 2014).

IV appealed the Virginia court's rulings on patent ineligibility and claim construction. This court affirmed the district court's rulings as to all three patents. *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015). Capital One initially cross-appealed from the dismissal of its antitrust counterclaims and third-party claims in the Virginia case. However, Capital One later dismissed its cross-appeal from the adverse judgment in the Virginia case after the district court in the Maryland action granted Capital One's motion to add its antitrust counterclaims and third-party claims in this case.

B

While the Virginia case was still pending, IV brought the present patent infringement action against Capital One in the District of Maryland, asserting five new patents. Those patents included three directed to methods, systems, and apparatuses for dynamically managing extensible markup language data; one directed to systems and methods for accessing a user's remotely stored data and files; and one directed to methods, devices, and systems for controlling access rights to data.

Capital One moved to add antitrust counterclaims and third-party claims of monopolization and attempted monopolization under section 2 of the Sherman Act, as well as unlawful asset acquisition under section 7 of the Clayton Act. In support of its motion, Capital One contended that it was alleging a different relevant market from the market alleged in the Virginia case, and that discovery in the Virginia case and events that occurred during and after the Virginia action justified its new counterclaims and third-party claims.

As in the Virginia case, Capital One alleged that IV had employed a business model of acquiring thousands of patents dealing with technology essential to the services offered by commercial banks and then seeking to force banks to license IV's entire portfolio of financial services patents for a fixed number of years at a high price.

The Maryland district court granted Capital One's motion to add the counterclaims and third-party claims. The court held that Capital One had alleged a plausible relevant market consisting of IV's portfolio of patents on financial services, that Capital One had sufficiently alleged that IV has monopoly power in that market, and that IV had intentionally acquired patents on existing products in the financial services industry so that it could "hold up banks that have substantially invested in those existing product designs." *Intellectual Ventures I LLC*, 99 F. Supp. 3d at 626. The court also rejected IV's argument that Capital One's counterclaims and third-party claims should be dismissed on the ground that they were barred by collateral estoppel stemming from the district court's ruling in the Virginia case. Accordingly, the court permitted the antitrust claims to remain in the case.

Of the five patents on which IV initially based its infringement claims in the Maryland case, IV voluntarily dismissed one at the outset; the district court dismissed two others as foreclosed by collateral estoppel based on a

decision by the United States District Court for the Southern District of New York; and the court held that the remaining two patents were directed to unpatentable subject matter under 35 U.S.C. §101. The court permitted IV to take an interlocutory appeal from its ruling dismissing all of the infringement claims, and this Court affirmed. *Intellectual Ventures I LLC v. Capital One Fin. Corp.* 850 F.3d 1332 (Fed. Cir. 2017).

Following the appeal, IV moved for summary judgment on Capital One's antitrust claims in the Maryland case. The district court granted the motion. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 280 F. Supp. 3d 691 (D. Md. 2017).

As in the Virginia case, the Maryland district court characterized Capital One's theory of the case as based on IV's aggregation of a large number of patents, concealment of those patents, and insistence on licenses to its patent portfolio at what Capital One called "supracompetitive" prices. According to Capital One's theory, IV exerted leverage over Capital One by threatening serial litigation that would be so expensive that the bank would be forced to accede to IV's demands. *Id.* at 696–97.

Capital One characterized the relevant market for purposes of its antitrust analysis as the market consisting of IV's portfolio of financial services patents. Capital One's expert, economist Fiona Scott Morton, testified that IV had a monopoly in that market, and that Capital One (as well as the other targeted banks) could not realistically "design around" the patents. According to Professor Scott Morton, that was because IV did not disclose the patents that related to particular technology and because the banks had already invested sunk costs into particular technology that would make any design-around process prohibitively expensive. *See id.* at 699.

Professor Scott Morton further stated that IV's pattern of aggregating patents, concealing its ownership of those

patents, and threatening serial litigation enabled IV "to exercise 'hold-up' power by demanding take-it-or-leave-it supracompetitive prices to license its financial services portfolio." *Id.* at 700. While acknowledging that IV's patent portfolio did not constitute a classic relevant market for antitrust purposes, Professor Scott Morton analogized "IV's financial services patent portfolio to a 'cluster market' that IV promotes as a single product (for which there are no close substitutes) at a supracompetitive price." *Id.* She asserted that IV exercises monopoly power in that market, even though she acknowledged that no bank, including Capital One, has agreed to purchase a license to the entire portfolio, and that IV has yet to prevail in any of its patent suits against banks. *Id.*

IV's response, as set forth in the opinion of its expert, Richard Gilbert, was to challenge Professor Scott Morton's market definition, "arguing that the proper definition is not a 'cluster' of financial services patents constituting a single product, but rather a collection of patents that relate to multiple distinct technology markets." *Id.* The flaw in Capital One's analysis, according to Professor Gilbert, was "its failure to analyze the distinct technology markets for which IV does have patents to determine whether there are alternative close substitutes that Capital One could turn to in order to avoid having to license from IV." *Id.* Professor Gilbert contended, moreover, that there was no market price at all for the patent portfolio, as no party had accepted IV's invitation to take a license at the price IV asked.

Judge Grimm acknowledged that Professor Gilbert's analysis of the relevant market "is firmly grounded in commonly used antitrust analysis." *Id.* at 701. Nonetheless, noting that the question of the identity of the relevant market in an antitrust action is typically a question of fact, Judge Grimm ruled that he could not conclude, as a matter of law, that Professor Scott Morton's relevant market analysis was incorrect, particularly in light of the difficulty that would be presented by any effort

"to perform the analysis of available substitutes that Professor Gilbert calls for to determine whether there are close substitutes to which Capital One could turn to avoid the reach of IV's portfolio." *Id.* at 703. The court concluded that a jury could reasonably conclude that "IV does, in fact, market its patents as a portfolio, rather than a collection of individual patents relating to a number of discrete technology markets[]." *Id.* at 704.

The court noted that "it is hard to deny that there is something concerning from an antitrust perspective about the way in which IV engages in its licensing business." *Id.* Judge Grimm then stated that if the only issue raised in IV's summary judgment motion were "whether there are genuine disputes of material fact that would entitle it to judgment as a matter of law on the issues of possession of monopoly power in a relevant market and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," he would deny the motion and allow the case to proceed to trial. *Id.*

However, Judge Grimm held that there were two dispositive legal issues, independent of the merits of Capital One's antitrust theories, that required the court to grant IV's summary judgment motion. Those issues were: (1) the immunity from antitrust liability provided by the so-called *Noerr-Pennington* doctrine; and (2) the collateral estoppel effect of the decision of the Virginia district court with respect to the antitrust issues raised by Capital One in the Maryland case.

1

In the district court, IV argued that the *Noerr-Pennington* doctrine barred Capital One's antitrust claims altogether. Capital One responded that *Noerr-Pennington* immunity did not apply to IV's conduct, because litigation was only a part of IV's broader monopolistic scheme. *Noerr-Pennington* immunity, according to Capital One,

would not insulate the entire scheme from antitrust scrutiny. In particular, Capital One argued that IV's aggregation and concealment of patents was actionable, because that activity "would be anticompetitive even if IV had never filed a lawsuit." *Id.* at 706.

Judge Grimm rejected Capital One's argument. He observed that Capital One's theory of antitrust liability under the Sherman Act relied on its allegations of "a carefully orchestrated campaign of patent aggregation, concealment, and sham litigation" on the part of IV. *Id.* With regard to Capital One's Clayton Act claim, Judge Grimm noted that while acquisition and aggregation of assets is the focus of a Clayton Act cause of action, the acquisition of assets is actionable under the Clayton Act "only where 'the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly,'" 15 U.S.C. § 18. To establish that effect, Judge Grimm explained, Capital One relied on IV's purported "campaign" to force banks to license IV's patent portfolio, which could not succeed absent the threat of litigation. 280 F. Supp. 3d at 706. Thus, the court concluded that the threat of litigation was "an integral component of IV's alleged strategy underlying all of Capital One's claims." *Id.* at 706-07.

In the alternative, Capital One argued that IV is not entitled to *Noerr-Pennington* immunity from antitrust liability, because IV's conduct fell within the "sham litigation" exception to the *Noerr-Pennington* doctrine. *See id.* at 707–08. The district court acknowledged that *Noerr-Pennington* immunity does not apply if a party brings an action, such as a patent infringement action, that is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noblepharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

Based on the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PREI*"), the court found the sham litigation exception inapplicable in this case. 280 F. Supp. 3d at 708–16. Under the *PREI* decision, the district court ruled, a lawsuit does not qualify as sham litigation unless the lawsuit is "'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits,' and 'the litigant's subjective motivation must be to interfere *directly* with the business relationships of a competitor.'" *Id.* at 709 (quoting *PREI*, 508 U.S. at 60–61).

The court concluded that Capital One "cannot establish that IV's litigation against it was objectively baseless because there were too many indicia of probable cause." *Id.* at 714. Noting that a court-appointed special master had concluded that IV would succeed on the merits on two of its patent claims, the court determined that a reasonable litigant could legitimately expect to succeed on the merits, and it rejected Capital One's argument that the loss before Judge Trenga in the Virginia case meant that IV could no longer reasonably believe that it would prevail in the Maryland case. *Id.* In addition, Judge Grimm noted that both of IV's suits were filed before the Supreme Court's decision in *Alice Corp. Pty. v. CLS Bank International*, 573 U.S. 208 (2014), which formed the basis for his ruling against IV on the issue of patent ineligibility. Because IV's infringement claims were not objectively baseless, and because IV's patent litigation was "integral to Capital One's antitrust claims," the court held that IV was entitled to *Noerr-Pennington* immunity from antitrust liability. 280 F. Supp. 3d at 716.

2

Judge Grimm's second ground for granting summary judgment was that collateral estoppel from the judgment

in the Virginia case barred Capital One's antitrust claims in the Maryland case.[2]

Analyzing the ruling in the Virginia case, Judge Grimm determined that Judge Trenga had ruled that IV's portfolio of financial services patents was not a relevant market for purposes of Capital One's antitrust claims. Based on that determination, Judge Grimm ruled that Capital One would not be permitted to relitigate that issue in the Maryland case, even though Capital One sought to introduce new facts in the Maryland case to support its relevant market claim. *See id.* at 716–24.

Although Capital One contended that its position as to the relevant market was not the same in the Maryland case as in the Virginia case, Judge Grimm found that the transcript from the oral argument on the motion to dismiss before Judge Trenga "demonstrates that Judge Trenga paraphrased the relevant market to confirm his understanding of what Capital One alleged, and that Capital One had confirmed that his definition was accurate." *Id.* at 718–19.

Judge Grimm noted that in the Maryland case Capital One had alleged "different facts to support a finding that [IV's] patents qualify as a relevant market for antitrust purposes." *Id.* at 719. In the Virginia case, Judge Grimm explained, Capital One had argued that IV's patent portfolio qualified as a relevant market "because Capital

---

[2]    IV initially raised claim preclusion, as well as issue preclusion, as a defense to the Sherman Act claims in the Maryland case. Judge Grimm, however, rejected IV's claim preclusion argument in his ruling allowing Capital One to file its antitrust claims. 99 F. Supp. 3d at 617–20. IV has not raised claim preclusion as to the Sherman Act claims in its brief on appeal, and we therefore do not address that issue.

One had a business need to avoid litigation, which it only could do by licensing the patents in the portfolio." *Id.* In the Maryland case, he observed, "instead of relying solely on the need to avoid litigation, which Judge Trenga already found insufficient to define a relevant market, Capital One also contends that 'continu[ing] to provide the online services they already offer without paying the cost-prohibitive licensing fees to the Intellectual Venture companies—the only source of such licenses—,' is a business necessity." *Id.* Although Judge Grimm initially allowed Capital One to assert its antitrust claims based on that change in the factual allegations, he ultimately rejected Capital One's argument regarding business necessity on summary judgment based on the absence of any evidence to support Capital One's new theory regarding the relevant market.

Judge Grimm explained his ruling as follows:

[D]iscovery has concluded, and to date, IV's patent litigation has not led to Capital One (or any other company) licensing the portfolio of thousands of financial services patents that IV amassed, as none of IV's patent claims have resulted in a judgment in IV's favor. Nor is there any other evidence that Capital One has to license IV's patent portfolio or has been unable to do business because it has not licensed the patents. Certainly, Capital One may feel compelled to license the patents to avoid litigation, but Judge Trenga already concluded that avoiding litigation is not a sufficient business necessity to define a relevant market.

*Id.* For that reason, the court concluded that the new factual allegations before the court had not materially altered the alleged relevant market from the relevant market that Capital One asserted in the Virginia case.

Before Judge Grimm, Capital One argued that collateral estoppel did not apply to Judge Trenga's rulings

in the Virginia case, because Judge Trenga had ruled against Capital One on two grounds—the failure to identify an appropriate relevant market, and the failure to allege facts making plausible Capital One's claim that IV wields unlawful monopoly power within that market. Capital One argued that collateral estoppel is not appropriate when the prior judgment was based on two separate grounds, either of which would have been sufficient to support the judgment. Judge Grimm, however, concluded that under Fourth Circuit law collateral estoppel was applicable in such a situation, and that the existence of alternative and independent grounds for decision in a prior case did not bar the application of collateral estoppel to either ruling. Accordingly, the court entered judgment on the antitrust counterclaims in favor of IV based on collateral estoppel, in addition to its reliance on *Noerr-Pennington* immunity. *Id.* at 719-24.

## II

On appeal, Capital One challenges the district court's application of collateral estoppel on the relevant market issue and its ruling that the *Noerr-Pennington* doctrine immunizes all of IV's challenged conduct from antitrust scrutiny. IV defends both grounds on which the district court based its summary judgment ruling, and it contends that Capital One's theory of antitrust liability has other fatal infirmities as well. Because we affirm the district court's judgment based on collateral estoppel, we do not decide the issues presented by the parties as to the *Noerr-Pennington* doctrine or Capital One's theory of antitrust liability.

## A

With regard to the Maryland district court's ruling on the issue of collateral estoppel, Capital One argues that the Virginia district court dismissed Capital One's antitrust claims on two alternative and independent grounds. Under governing principles of the law of judgments,

Capital One argues, when a prior judgment is based on two independent grounds, collateral estoppel does not apply to either ground of decision, and the losing party in the first action is not estopped from relitigating either of those two issues in subsequent litigation.

In a case such as this one, involving general principles of the law of judgments that do not implicate questions within this court's exclusive jurisdiction, we apply the law of the regional circuit in which the district court is located. *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1353 (Fed. Cir. 2017); *United Access Techs., LLC v. CenturyTel Broadband Servs. LLC*, 778 F.3d 1327, 1330 n.1 (Fed. Cir. 2015); *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1341 (Fed. Cir. 2013). The District of Maryland is in the Fourth Circuit, so Fourth Circuit law governs the collateral estoppel issue in this case.

Judge Grimm characterized Judge Trenga's judgment in the Virginia case as being based on two independent grounds: Capital One's failure to identify an appropriate relevant market, and Capital One's failure to allege the exercise of monopoly power within that relevant market. Nonetheless, Judge Grimm rejected Capital One's argument that collateral estoppel was inapplicable to either issue. He concluded, instead, that under Fourth Circuit law collateral estoppel would apply in this setting to a determination in a prior case even if that determination were only one of two alternative grounds for dismissal in the prior action. 280 F. Supp. 3d at 723.

In their briefs on appeal, the parties dispute whether Judge Grimm properly applied Fourth Circuit law on collateral estoppel. IV argues that collateral estoppel applies to both of the alternative grounds of decision relied on by the Virginia court; Capital One argues that collateral estoppel applies to neither ground.

The Fourth Circuit has adopted the widely recognized principle that collateral estoppel (also known as issue

preclusion) applies to an issue or fact presented in a case only if

> (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004); *Ramsay v. U.S. Immigration & Naturalization Serv.*, 14 F.3d 206, 210 (4th Cir. 1994); *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d at 1337.

Capital One argues that the third of the five requirements for applying collateral estoppel—that the issue or fact in question must have been "critical and necessary to the judgment" in the prior proceeding—was not satisfied in this case. Asserting that Judge Trenga resolved the antitrust claims against Capital One in the Virginia case on two separate and independent grounds, Capital One argues that neither of those two grounds was "critical and necessary to the judgment" in that case, and accordingly neither ground can give rise to collateral estoppel.

B

To begin with, the premise of Capital One's argument is wrong. The two issues on which Judge Trenga based his dismissal order are not independent and alternative grounds of decision, but are integrally related. Specifically, the presence of a relevant antitrust market is critical both to whether a relevant market has been identified and to whether the defendant possesses monopoly power in a

relevant market.  As Judge Trenga explained, the first element of the offense of monopolization under section 2 of the Sherman Act is "the possession of monopoly power in the relevant market."  Trenga Op. at *4 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  It is artificial to divide that element into (1) the possession of monopoly power and (2) a relevant market, because the possession of monopoly power is meaningless without reference to the market in which that power is exercised.

What Judge Trenga ruled was that Capital One failed to plausibly allege a proper relevant antitrust market and failed to plausibly allege that IV wields monopoly power within that antitrust market.  The requirement of a relevant antitrust market is a necessary component of both determinations; therefore, Judge Trenga's finding that a relevant antitrust market was not plausibly pleaded is fatal to Capital One's position on both issues.  Judge Trenga's finding on the relevant market issue therefore satisfied the requirement, for collateral estoppel purposes, that an issue of fact decided in the prior proceeding be critical and necessary to the judgment in that proceeding.

This analysis is supported by comment i and illustration 16 in section 27 of the Second Restatement of Judgments.  The Second Restatement generally provides that if a judgment of a court "is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."  Restatement (Second) of Judgments § 27 cmt. i (1982).  However, that general rule is subject to an express caveat that if "the first action, even though decided on alternative grounds, necessarily adjudicated the issue" in dispute in

the second action, the determination in the first action would be conclusive in the second. *Id.* at cmt. i & illus. 16.[3]

This case fits that exception. Although Judge Trenga separately concluded that Capital One had not proposed an appropriate relevant market and that it had not plausibly alleged that that IV wields unlawful monopoly power within that market, both grounds required a showing of a relevant antitrust market, and therefore Judge Trenga's decision "necessarily adjudicated the issue" of the appropriate relevant market. Judge Grimm was therefore correct in holding that Judge Trenga's determination on the relevant market issue in the Virginia case was conclusive on that issue in the Maryland action.

C

Even assuming, as Capital One argues, that the two issues decided by Judge Trenga are not integrally related, but instead should be treated as independent and alternative grounds for decision, we still conclude that Judge Grimm was correct in applying collateral estoppel to Judge Trenga's relevant market ruling, although our analysis differs somewhat from Judge Grimm's.

---

[3]    Although that principle has arisen infrequently in federal cases, one example in the case law is *In re McCall*, 76 B.R. 490, 495 & n.5 (E.D. Pa. 1987). In that case, the court rejected the argument that collateral estoppel should not apply to alternative findings of fraud and unjust enrichment; the court held that it was clear that the finding of unjust enrichment depended on the finding of fraud. Because a finding of fraud was necessary to both grounds of decision in the first case, the court held that it was appropriate to apply collateral estoppel to that finding in the second case.

1

In *In re Microsoft Corp. Antitrust Litigation*, the Fourth Circuit embraced the general principle that "where the court in the prior suit has determined two issues, either of which could independently support the result, then neither determination is considered essential to the judgment. Thus, collateral estoppel will not obtain as to either determination." 355 F.3d at 328 (quoting *Ritter v. Mount St. Mary's Coll.*, 814 F.2d 986 (4th Cir. 1987)); *see also Lisa Lee Mines v. Director, Office of Workers' Compensation Programs*, 86 F.3d 1358, 1363 (4th Cir. 1996) ("[H]oldings in the alternative, 'either of which independently would be sufficient to support the result, . . . [are] not conclusive with respect to either issue standing alone.") (quoting Restatement (Second) of Judgments § 27 cmt. i (1982)); *C.B. Marchant Co. v. E. Foods, Inc.*, 756 F.2d 317, 319 (4th Cir. 1985) ("It was once the rule that 'if a court decided a case on two grounds, each is a good estoppel.' However, the modern rule is that if a judgment rests on independent grounds, either of which would support the result, the judgment is not conclusive with respect to either issue standing alone." (citations omitted)).[4]

IV seeks to distinguish the *Microsoft* case, as did Judge Grimm, on the ground that it involved offensive collateral estoppel rather than defensive collateral estoppel. Offensive collateral estoppel is issue preclusion in which the plaintiff seeks to bar the defendant from relitigating an issue on which the defendant has lost against a different plaintiff in a prior case. Defensive collateral estoppel is

---

[4]    This court has previously characterized the Fourth Circuit's position as declining to give preclusive effect to a prior court's ruling if it was one of the several alternative holdings that were each independently sufficient to support a judgment. *See Phil-Insul Corp.*, 854 F.3d at 1356–57 n.2; *TecSec*, 731 F.3d at 1343–44.

issue preclusion in which the defendant seeks to bar the plaintiff from relitgating an issue on which the plaintiff has lost against a different defendant in a prior case. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4, 329 (1979). This case, IV points out, involves defensive collateral estoppel because IV, the counterclaim defendant, was urging the application of estoppel against Capital One, the counterclaim plaintiff, which had lost on that issue in a prior case.

Courts are more cautious about applying offensive collateral estoppel than defensive collateral estoppel. That is because of the "greater possibility for unfairness from the use of offensive collateral estoppel," due to the risks that the defendant may not have had the same incentive to defend vigorously in the first action and may not have had procedural opportunities in the first action that could have produced a different result in that case. *Microsoft*, 355 F.3d at 326; *see also Parklane Hosiery*, 439 U.S. at 331–33. For that reason, courts are accorded discretion to deny offensive collateral estoppel when the circumstances suggest that applying the doctrine would be unfair to the defendant. *See Parklane Hosiery*, 439 U.S. at 329–33.

The Fourth Circuit in *Microsoft*, an offensive collateral estoppel case, recognized the distinction between offensive and defensive collateral estoppel and acknowledged the reasons that a court might decline to apply offensive collateral estoppel in particular cases. To be sure, the *Microsoft* court did not predicate its decision against preclusion on the fact that the case involved offensive collateral estoppel. However, the court acknowledged that "[t]he caution that is required in application of offensive collateral estoppel counsels that the criteria for foreclosing a defendant from relitigating an issue or fact be applied strictly" in that context. *Microsoft*, 455 F.3d at 327.

Citing IV argues that the Fourth Circuit's decision in *Ritter v. Mount St. Mary's College*, 814 F.2d 986 (4th Cir.

1987), indicates that the court would approve the use of defensive collateral estoppel in a case such as this one. The *Ritter* case, however, arose in a different procedural posture from this one. In *Ritter*, the district court decided two issues in favor of the defendant at an early stage of the case. On appeal, the court of appeals affirmed on one of the issues but did not address the other. On remand, the district court reinstated its ruling on the second issue and entered a final judgment for the defendant. On the second appeal, the Fourth Circuit held that it was permissible for the district court to adopt its earlier ruling on the second issue, given that the issue had been fully litigated before the same district court at an earlier stage of the same case. *See* 814 F.2d at 993–94.

The Fourth Circuit in the *Microsoft* case distinguished *Ritter*, but not on the ground that it involved defensive rather than offensive collateral estoppel. Instead, the court emphasized that *Ritter* "involved no prior judgment from another proceeding but rather a prior ruling *in the same case*." 355 F.3d at 328 (emphasis in original). The *Microsoft* court then explained that the court in *Ritter* was "essentially applying a law-of-the-case principle" even though it "called it collateral estoppel, and applied it in the exceptional circumstances of that case, where the parties were the same, the issues were the same, the facts were the same, and even the court was the same." *Id.* Based on the unusual circumstances in the *Ritter* case and the Fourth Circuit's later characterization of that decision, we are satisfied that the Fourth Circuit has not adopted a general exception, for cases involving defensive collateral estoppel, to the rule denying collateral estoppel effect to alternative and independent determinations.

Some circuits have held, consistent with IV's argument, that each alternative determination that supported the first court's ruling forms an independent ground for collateral estoppel in the second case, at least when a party is asserting defensive collateral estoppel. *See Jean Alexander*

*Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 251–54 (3d Cir. 2006); *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986) (citing *Irving Nat'l Bank v. Law*, 10 F.2d 721, 724 (2d Cir. 1926)); *In re Westgate-Cal. Corp.*, 642 F.2d 1174, 1176–77 (9th Cir. 1981); *cf. Deweese v. Town of Palm Beach*, 688 F.2d 731, 734 (11th Cir. 1982) ("Normally, each alternative basis would form an independent ground for collateral estoppel. . . . In this case, however, the existence of alternative grounds makes the application of offensive collateral estoppel problematic.").

That position is the one taken in the First Restatement of Judgments. That Restatement posited that "[w]here the judgment is based upon matters litigated as alternative grounds, the judgment is determinative on both grounds, although either alone would have been sufficient to support the judgment." Restatement of Judgments § 68 cmt. n (1942). However, the Second Restatement of Judgments rejected the position taken on that issue by the First Restatement. Based in large part on the reasoning of the Second Circuit's decision in *Halpern v. Schwartz*, 426 F.2d 102 (2d Cir. 1970), the Second Restatement adopted, as a general rule, the position that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments § 27 cmt. i & reporter's note, at 270 (1982).

Several justifications have been advanced in support of the rule that preclusive effect should not be accorded to one of several alternative grounds of decision. The justifications given in the *Halpern* case and echoed in the Second Restatement are (1) it would unfairly burden a party to require it to take an appeal challenging multiple grounds of decision simply to avoid the preclusive effect of one of those grounds; (2) such a party might not foresee the risk of a potential collateral estoppel effect from the ruling in question and would have little other motivation to take an

appeal from an alleged error that had no effect on the judgment; (3) if the reviewing court is confident as to the correctness of one of the alternative grounds of decision, it might not feel constrained to give rigorous consideration to the alternative grounds; and (4) the requirement of taking an appeal to avoid collateral estoppel in possible future suits would create extra appellate litigation even though the future suits might never come to pass. *Halpern*, 426 F.2d at 105–06; *see* Restatement (Second) of Judgments § 27 cmt. i.

Several circuits have adopted the general rule espoused in the Second Restatement with regard to the application of collateral estoppel in the case of alternative and independent grounds for decision. *See Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1008 (7th Cir. 1997) (en banc); *Baker Elec. Coop. v. Chaske*, 28 F.3d 1466, 1475–76 (8th Cir. 1994) (applying North Dakota law); *Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1213–14 n.25 (5th Cir. 1991); *Turney v. O'Toole*, 898 F.2d 1470, 1472 n.1 (10th Cir. 1990). In light of the above analysis, we conclude, principally based on the *Microsoft* case, that the Fourth Circuit would align itself with the latter circuits and, as a general rule, would decline to give preclusive effect in a later case to each of several alternative and independent grounds for decision in the first litigation.

That, however, is not the end of the story. In most of the cases in which a question has been raised as to the preclusive effect of alternative grounds of decision, the moving party has argued that preclusion on one of those alternative grounds would result in judgment for that party or at least would advance its litigation position. In some cases, however, any one of the alternative grounds that were independently sufficient to dispose of the first action would also be independently sufficient to decide the second. In that circumstance, the policies underlying the non-preclusion rule adopted in the Second Restatement are significantly diluted.

The policy considerations invoked in the *Halpern* case and the Second Restatement have force with regard to cases in which only one of several grounds for decision in the first case is pertinent to the second. However, the case for applying collateral estoppel to alternative determinations is much stronger when all of the alternative determinations in the first case would be independently sufficient to dispose of the second case. In such a case, since all the alternative determinations would be pertinent to the second case, the losing party in the first case would not be discouraged from taking an appeal because of the presence of a strong alternative determination that is irrelevant to the second case. Likewise, a party would be less likely in such a setting to take an otherwise improvident appeal simply out of a desire to avoid preclusion on one of multiple adverse rulings.

In such a setting it has been suggested that the non-preclusion rule of the Second Restatement should give way. *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4421, at 624 (3d ed. 2016) (suggesting that preclusion should be available "so long as each and any of the findings that were independently sufficient to dispose of the first action would also be independently sufficient to dispose of the second action"). Such an exception to the non-preclusion rule makes sense, as there is no material difference between the situation in which each of the determinations on which the adverse decision in the first case was based would lead to an adverse decision in the second case, and a situation in which preclusion is based on a single adverse determinations in the earlier case.

The few cases that have addressed the issue have held that collateral estoppel applies in this setting, even in circuits that have not adopted the First Restatement rule. *See Zeno v. United States*, No. DKC 09-0544, 2009 WL 4910050, at *5 (D. Md. Dec. 11, 2009) (applying collateral estoppel to alternative grounds for dismissal in prior case:

"[D]espite the fact that the court's previous decision rested on three alternative grounds for dismissal—personal jurisdiction, venue, and immunity—all of the grounds apply in this case."), *aff'd*, 451 F. App'x 268 (4th Cir. 2011); *NOW v. Operation Rescue*, 747 F. Supp. 760, 768 (D.D.C. 1990) (where "the Virginia court's alternative determinations are adopted in their entirety as alternative holdings in this judgment," all three alternative holdings of the Virginia court "are entitled to preclusive effect in this litigation").

Although no appellate decision in the Fourth Circuit has adopted this exception to the general rule of non-preclusion for alternative determinations, the exception has not been rejected by the Fourth Circuit (or any decision of this court applying Fourth Circuit law), and it has been adopted by at least one district court within the Fourth Circuit. *See Zeno v. United States*, 2009 WL 4910050, at *5.

As noted, the Fourth Circuit in *Microsoft* did not adopt an inflexible rule that collateral estoppel is unavailable as to alternative and independent determinations, no matter what the circumstances. In light of the significant differences between cases in which only one of several alternative grounds would be applicable in the second litigation, and cases in which all of the alternatives would be applicable in that litigation, we think it likely that the Fourth Circuit would adopt the exception to the general rule of non-preclusion that we have described.

The case for applying collateral estoppel when all of the alternative grounds for decision in the first case apply in the second is even stronger when the two cases are co-pending. In that instance, the losing party in the first case is fully aware of the danger that an estoppel will be applied in the second case and has every incentive to seek review of the adverse decision in the first case. The policy against duplicative litigation is at its strongest where the losing plaintiff in the first case is in a position to make a conscious

choice whether to pursue an appeal in the first case or begin anew by bringing a second action.

The Second Circuit held that there was no reason to deny collateral estoppel effect to a prior judgment "in an instance where the plaintiff was pursuing the two actions simultaneously and thus could fully anticipate the potential barring effect of the earlier judgment in deciding not to appeal from [the prior] determination." *Williams v. Ward*, 556 F.2d 1143, 1154 (2d Cir. 1977). In an opinion for the court in the *Williams* case, Judge Friendly explained that the concern that a party "would be forced to clairvoyant anticipation of the effects of determined issues on future indeterminate collateral litigation, which neither party can be sure will occur, and would be forced to take cautionary appeals even when the later litigation might never occur, is clearly not applicable here, where Williams was prosecuting both actions at once." *Id.* (quotation marks omitted); *see also Winters v. Lavine*, 574 F.2d 46, 68 (2d Cir. 1978) (same).[5] In light of the Second Circuit's analysis, we think this consideration makes it even more likely that the Fourth Circuit would hold collateral estoppel applicable to both of two alternative grounds, when both grounds would be dispositive in the second case and when the two cases were co-pending at the time the plaintiff decided to proceed with the second case after an adverse decision in the first.

2

We must now determine how that preclusion principle applies to the facts of this case. As noted, Judge Grimm found that Judge Trenga had granted judgment for IV on

---

[5]    The Second Circuit in *Williams* and *Winters* explained that a case in which the party subject to estoppel is prosecuting both relevant actions at once does not raise the concerns noted in *Halpern*. *See Winters*, 574 F.2d at 68; *Williams*, 556 F.2d at 1154.

two alternative grounds: (1) that Capital One failed to identify a relevant market for antitrust purposes, and (2) that Capital One failed to plausibly allege that IV had monopoly power in a relevant market. Judge Grimm concluded that either one of those alternative grounds would be sufficient to defeat Capital One's Sherman Act claims, because the issues before the court in the Maryland case are the same as those that were decided by Judge Trenga in the Virginia case. If Judge Grimm's determination on that score is correct, the rule on collateral estoppel that we have discussed would support Judge Grimm's conclusion that summary judgment should be granted to IV on Capital One's Sherman Act claims.

Capital One, however, disputes Judge Grimm's finding that the issues in the two cases are the same. Capital One argues that the relevant market asserted in the Maryland case is different from the relevant market asserted in the Virginia case, and for that reason collateral estoppel cannot be applied with regard to that issue. In particular, Capital One contends that in the Maryland case the relevant market consisted of IV's portfolio of patents on financial services for commercial banks, while in the Virginia case the relevant market consisted of the "market" or "ex post market" for "technology enabling business processes common throughout the commercial banking industry in the United States."[6] Because the two proposed relevant antitrust markets are different, Capital One argues, the decision in the Virginia case should not be given collateral

---

[6]   The parties use the term "ex post" to refer to goods or processes that are already in commercial use, rather than inventions directed to goods or processes that have not yet been commercialized.

estoppel effect in the Maryland case even under the legal standard that IV advocates.[7]

When Judge Trenga sought clarification of Capital One's definition of the market, Capital One's counsel explained that the market consisted of the patents owned by IV relating to commercial banking services, and that IV controlled 100 percent of that market because there was "no way to get around them."

---

[7]    Capital One also asserts in passing that it alleged new facts in the Maryland case. Collateral estoppel cannot be defeated, however, by offering evidence in the second proceeding that could have been adduced in the first proceeding but was not; absent materially changed circumstances, the ruling in the initial case is preclusive. *See Oyeniran v. Holder*, 672 F.3d 800, 807 (9th Cir. 2012) ("The introduction of new evidence on a matter previously resolved is not an exception to collateral estoppel."); *Hickerson v. City of N.Y.*, 146 F.3d 99, 108 n.6 (2d Cir. 1998); *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254–55 (D.C. Cir. 1992); *Jones v. United States*, 466 F.2d 131, 136 (10th Cir. 1972). That is true even if a different legal theory is advanced in the second action. *See United States v. United Techs. Corp.*, 782 F.3d 718, 728–29 (6th Cir. 2015); *Falconer v. Meehan*, 804 F.2d 72 (7th Cir. 1986). Capital One argues that there is evidence that IV acquired additional patents in the period between the two cases. Judge Grimm found that IV had not acquired any new patents in the relevant investment funds since Capital One filed its antitrust claims in the Virginia action. 280 F. Supp. 3d at 718. In any event, however, Capital One does not suggest how any marginal increase in the number of patents in IV's portfolio is material to the antitrust issues in this case.

Judge Trenga noted that Capital One did not allege that the proposed market in the Virginia case "contains all, even any, of the available substitutes for the technologies included within that proposed market or that the included technologies all pertain to the same aspects of the commercial banking operations, or even to those at issue in this case." Trenga Op. at *5. Tracking counsel's representation, Judge Trenga concluded that "Capital One's proposed technology market equates to IV's 'portfolio of 3,500 or more patents that [IV] alleges cover widely used financial and retail banking services' in the United States because IV's patent portfolio presents an 'inescapable threat' to providers of financial services." *Id.*

Unlike cases in which customers are "locked in" by business necessity to using particular patents, Judge Trenga found that Capital One's relevant market reduces to what IV relies on to justify its allegedly extortionate demands to buy 'patent peace' and avoid the paralyzing costs of 'wave after wave of burdensome and expensive litigation.'" *Id.* Judge Trenga added that "the only 'business necessity' alleged is, in essence, the business need to avoid future litigation." *Id.* He stated, further, that the "actual technologies included within the proposed market, within broad limits, appear nearly irrelevant, since it is not the substantive, commercial usefulness or the merits of the technology that defines the market; but simply the patents in that market used to threaten Capital One, which consist entirely of IV's patent portfolio." *Id.* Only in that sense, Judge Trenga explained, "are there no 'substitutes' for the patents that IV controls and uses to threaten and coerce the commercial banks." For that reason, Judge Trenga concluded, "Capital One's proposed market is not a 'relevant market' under any recognized antitrust jurisprudence." *Id.*

In the Maryland case, Capital One alleged that the relevant antitrust market was "the 3,500 patents in [IV's] financial-services portfolio." Capital One argues that the

relevant market alleged in the Maryland case is different from the relevant market alleged in the Virginia case. For that reason, Capital One argues, Judge Trenga's ruling that the relevant market asserted in the Virginia case was not a relevant antitrust market is not entitled to preclusive effect in the proceedings before Judge Grimm.

What Capital One's argument overlooks is that Judge Trenga's analysis of the relevant market issue was based on his interpretation of Capital One's argument (based in part on counsel's representations) regarding the relevant market in the Virginia case. What Judge Trenga decided in the Virginia case is that a market consisting of the "3,500 or more patents that [IV] alleges cover widely used financial and retail banking services in the United States" is not a relevant market for antitrust purposes. It is that decision to which Judge Grimm attached preclusive effect in the Maryland case. Given that the description of the alleged market on which Judge Trenga predicated his ruling is identical in all material respects to the market alleged in the Maryland case, it was appropriate for Judge Grimm to give preclusive effect to Judge Trenga's ruling on that issue.

Although Capital One faults Judge Trenga for his characterization of its relevant market allegations, Capital One in its brief on appeal in the Virginia case, which was filed before Capital One withdrew its cross-appeal in that case, stated that its allegations supported "a distinct market" that was "limited to IV's portfolio because IV alleged that its portfolio license is indispensable to commercial banking." Br. of Cross-Appellants at 68, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015). Thus, in that pleading, where Capital One was not facing a claim of collateral estoppel, Capital One did not

disclaim Judge Trenga's characterization of the relevant market, but embraced it.[8]

At bottom, what Capital One is suggesting is that (1) Judge Grimm should have looked behind Judge Trenga's characterization of the relevant market asserted by Capital One; (2) he should have concluded that Judge Trenga's characterization of Capital One's position was erroneous; and (3) he should have found that the relevant markets claimed in the two cases were therefore not the same. But

---

[8] Capital One also argues that the courts' characterization of the "business necessity" issue was different in the two cases, and that the alleged relevant markets were therefore necessarily different. In the Virginia case, Capital One notes, the court referred to the "business need to avoid future litigation," while in the Maryland case, the court referred not only to Capital One's need to avoid litigation, but also to its need to continue providing on-line banking services without paying cost-prohibitive licensing fees.

The difference in the manner in which the two courts referred to business need does not reflect a difference in the relevant market alleged in the two cases. Capital One made it clear from the outset of the Virginia case that it needed to continue providing banking services and that IV's tactics and its accumulation of patents adversely affected its ability to do so. *See* Answer to Complaint at 13, 17, 27–28, 32–34, *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, No. 1:13-cv-00740 (E.D. Va. Oct. 14, 2013). Judge Trenga's point in describing the "business necessity" to avoid future litigation was simply that Capital One was alleging that the injury to its commercial operations resulted from IV's litigation threats, not from any valid IV-owned patents that actually covered Capital One's banking practices.

Judge Trenga's characterization was based on the position taken by Capital One in the proceedings before him. It is only now that Capital One has sought to distance itself from that position in order to suggest that the Maryland case is different from the Virginia case.

Moreover, even if Judge Trenga were in error in characterizing the alleged relevant market in the case before him, that would not be a basis for granting relief to Capital One from Judge Grimm's preclusion decision. A collateral estoppel determination is based on what the prior court ruled, and the prior court's ruling cannot be dissected to determine whether it was somehow based on an incorrect legal or factual basis.

Rules of preclusion assume the correctness of the prior judgment. All that matters is that the issue has actually been litigated and has been validly and finally determined. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) ("even an erroneous judgment is entitled to res judicata effect"); *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong . . . ."); *FCA US, LLC v. Spitzer Autoworld Akron, LLC*, 887 F.3d 278, 288–89 (6th Cir. 2018) ("issue preclusion prevents the relitigation of wrong decisions just as much as right ones"); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1296 (5th Cir. 1995) ("It is well settled . . . that even arguably erroneous judgments have preclusive effect if the requirements for collateral estoppel are satisfied.").

If Capital One had wanted to dispute Judge Trenga's characterization of the relevant antitrust market, it could have done so by challenging that characterization on appeal from the judgment in that case. Instead, as noted, Capital One agreed in its appeal brief in the Virginia case (before withdrawing its appeal) that IV's patent portfolio represented a relevant antitrust market. Under those

circumstances, Capital One cannot now contend that Judge Trenga mischaracterized the relevant antitrust market asserted in that case and that Judge Trenga's rulings in that case therefore should not be given collateral estoppel effect in this one.

For the reasons given by the Second Circuit in *Williams v. Ward* and *Winters v. Lavine*, this case is a particularly strong candidate for applying collateral estoppel, because of the co-pendency of the Virginia and Maryland lawsuits. Capital One sought to file its antitrust claims in the Maryland case while Capital One's cross-appeal in the Virginia case was still pending. When Judge Grimm granted Capital One's motion to add its antitrust claims in the Maryland case, Capital One moved to dismiss its cross-appeal from the Virginia judgment. IV objected to the motion to dismiss on the ground that Capital One was seeking "to prevent the district court decision below from having its effect as a final judgment by an Article III court, and (to try) to get the same issues to go forward in what Capital One believes to be a more favorable forum." Cross-Appellees' Response to Cross-Appellant's Motion to Dismiss the Cross-Appeal at 6–7, *Intellectual Ventures I LLC v. Capital One Fin. Corp.* (Fed. Cir. 2015) (Nos. 2014-1506, -1515).

Capital One thus withdrew its cross-appeal in the Virginia case in favor of litigating its antitrust claims in the Maryland case despite the known risk—pointed out by IV—that abandoning its appeal from the adverse decision in the Virginia case could result in a collateral estoppel bar to its claims in the Maryland case. While Capital One's decision to withdraw its appeal may be understandable in light of Judge Grimm's order allowing Capital One to litigate its antitrust claims in the Maryland action, it was nonetheless an action taken with full awareness of the risk of preclusion based on the adverse rulings in the Virginia case.

Applying the principles of collateral estoppel as we believe the Fourth Circuit would apply them, we sustain the judgment as to Capital One's Sherman Act claims based on collateral estoppel. As discussed above, the two issues decided by Judge Trenga are not alternative and independent grounds for decision. And even if the two issues are regarded as alternative grounds for decision, each was independently sufficient to dispose of the first action and therefore would be independently sufficient to dispose of the second.

### D

For similar reasons, collateral estoppel applies to Capital One's claim under section 7 of the Clayton Act.

In addition to finding that Capital One's antitrust theories failed on the "relevant market" issue, Judge Trenga dismissed Capital One's claim under section 7 of the Clayton Act on the ground that Capital One had failed to "allege that IV's acquisitions, standing alone, have lessened competition as if, for example, IV had acquired all substitutes or competing technologies." Trenga Op. at *9. The anticompetitive effects about which Capital One complained, Judge Trenga explained, arose from IV's litigation threats, based on the patents it had accumulated. For that reason, Judge Trenga stated, "the complained of anticompetitive effects do not arise from the acquisition of the patents, but from conduct that post-dates the acquisition." *Id.*

Like Judge Trenga, Judge Grimm based his ruling on all the antitrust claims—including the Clayton Act claim—on the same failure to allege or prove a relevant antitrust market. Like Judge Trenga, Judge Grimm also held that "while patent acquisition and aggregation is the focus of the Clayton Act claim, acquisition is actionable under the Clayton Act only where 'the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.'" 280 F. Supp. 3d at 706 (citing 15 U.S.C. § 18). And like Judge Trenga, Judge Grimm found that the

requisite effect on competition depended on IV's "campaign," i.e., that the threat of patent litigation was "an integral component of IV's alleged strategy underlying all of Capital One's claims." *Id.*

Capital One argues that because the Virginia court held that Capital One had not sufficiently pleaded either a relevant antitrust market or anticompetitive acquisitions, the Virginia court's dismissal did not depend on either ground alone, and neither was entitled to be accorded preclusive effect in the Maryland case. As noted above, however, because both were viable grounds for decision in the Maryland case, and because Judge Grimm relied on both of those grounds, the rule against applying collateral estoppel to alternative grounds of decision would not apply in this instance.

Accordingly, we affirm the judgment of the district court on all of Capital One's antitrust claims on collateral estoppel grounds. For that reason, we find it unnecessary to reach the parties' dispute regarding the *Noerr-Pennington* doctrine or IV's arguments on the merits of Capital One's antitrust claims.

**AFFIRMED**